# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**FILED**

AUG – 3 2016

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

BEDATANU BANERJEE, on behalf of the United States of America

)
)
)

Plaintiff,

)
)
)

v.

)
)
)
)

TATA CONSULTANCY SERVICES LIMITED, TATA GROUP, and TATA SONS, LTD.

)
)
)
)
)

Defendants.

)
)

CIVIL ACTION NO **16 - 1170**

**FILED UNDER SEAL**

JURY TRIAL DEMANDED

---

## QUI TAM-FALSE CLAIMS ACT COMPLAINT

### I. INTRODUCTION

On behalf of the United States of America, and pursuant to the *qui tam* provisions of the United States False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, Plaintiff, BEDATANU BANERJEE ("Relator") files this *qui tam* Complaint for treble damages and civil money penalties against TATA CONSULTANCY SERVICES LIMITED, TATA GROUP and TATA SONS, LTD. (collectively, the "Defendants" or "TCS"), through its systemic visa fraud and abuse of immigration processes.

In support of these claims, Relator avers as follows:

## II. NATURE OF THE ACTION

1. This is an action by Relator Bedatanu Banerjee ("Relator"), on behalf of the United States, against Defendants Tata Consultancy Services Limited, Tata Group, and Tata Sons, Ltd. (collectively "TCS"), to recover penalties and damages arising from false records and statements made and used by TCS in an effort to secure visa petitions for their employees, to increase its revenues on the backs of its workers and at the expense of the United States tax payers and its resources that were utilized to process fraudulent visa submissions to the United States Citizenship and Immigration Services ("USCIS").

## III. JURISDICTION & VENUE

2. This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, creating subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a).

3. The Court has personal jurisdiction over Defendant TCS because it transacts business in this judicial district.

4. Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because, among other things: (i) TCS transacts business in this district; and (ii) TCS committed violations of law within this district.

5. Before filing this complaint, Relator served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

6. Relator has complied with all other conditions precedent to bringing this action.

7. Relator is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the Government before filing this action.

8.  Upon information and belief, the allegations contained herein occurred from on or about 2002-2013 and upon reasonable belief, prior to and continuing through the present ("Relevant Period").

## IV. PARTIES

9.  Relator is over the age of eighteen years and is currently a resident citizen of Pennsylvania.

10. Relator worked at TCS for an extended period of time during the Relevant Period.

11. In his role at TCS referenced above, Relator was responsible for multiple proactive technology suggestions to the client for project implementations which were ultimately accepted, appreciated by them and successfully implemented under Relator's direction.

12. During the Relevant Period, an initial L-1 application was submitted on behalf of Relator by TCS along with multiple extensions and an upgraded position, from L-1B to L-1A.

13. Tata Consultancy Services Limited is an Indian multinational information technology service, consulting and business solutions, headquartered in Mumbai, Maharashtra, and within the relevant time period, had an office located at 9201 Corporate Boulevard, Suite 320, Rockville, MD 20850. It is a subsidiary of the Tata Group and operates in 46 countries.

14. According to Wikipedia, TCS is now placed among the 'Big 4' most valuable IT services brands worldwide. In 2015, TCS is ranked 64th overall in the Forbes World's Most Innovative Companies ranking, making it both the highest-ranked IT services company and the first Indian company. TCS is the world's 10th largest IT services provider, measured by the revenues. As of December 2015, it is ranked 10th on the Fortune India 500 list.

15. According to Wikipedia, TCS was the fifth-largest United States visa recipient in 2008 (after Infosys, CTS, Wipro and Mahindra Satyam). In 2012, the Tata group companies, including TCS, were the second largest recipients of H-1B visas. As of June 2014, TCS has over 300,000

employees. As of October 2015, TCS had a total of over 335,620 employees. TCS is the world's third largest IT employer behind IBM and HP.

16. According to TCS's Annual Report, 2015-2016, filed April 2016, TCS had annual revenues totaling US$16.54 billion.

17. Tata Group is an Indian multinational conglomerate holding company headquartered in Mumbai, Maharashtra, India, providing consultancy services to end clients in several states within the United States.

18. Tata Sons, Ltd. is the holding company of the Tata Group and upon information and belief, holds the bulk of shareholding in these companies. Tata Sons is located at Bombay House 24, Homi Mody Street Mumbai 400 001 India. According to Tata Sons's website, Tata Sons is the promoter of the major operating TCS companies and holds significant shareholdings in these companies. Additionally, Tata companies are commonly referred to as the Tata group and the Chairman of Tata Sons as Chairman of the Tata group.

## V.  FACTUAL ALLEGATIONS

19. TCS brings foreign nationals and oftentimes their families, on separately filed applications, into the United States in order to perform work and fulfill contracts with its customers. A substantial number of such foreign nationals are working in the United States under the H-1B, L-1A and L-1B visa programs, having relevancy to this matter.

20. Brief summaries of the laws that are relevant to Relator's allegations are below:

- Pursuant to 8 U.S.C. § 1184(i)(1)(A), the H-1B visa category applies to people who perform services in a **specialty occupation** and the employee must meet certain criteria to qualify. The H-1B program requires a foreign worker to perform work in a **"specialty occupation"** for a **U.S. employer**. Additionally, the worker must be paid the prevailing wage in the area of employment. A Labor Condition Application (LCA) is filed with each application to the Department of Labor. *See* 20 C.F.R. 655.760. H-1B visa is a non-immigrant visa that allows an employer to temporarily employ a foreign national in a "specialty occupation." A specialty occupation is one that requires a

theoretical and practical application of a body of specialized knowledge and attainment of a bachelor's or higher degree or its equivalent in experience for the specific specialty.

The H-1B application process is highly regulated and requires the submission of a Labor Condition Application that describes the intended occupation and specific geographical place of employment and certifies that the salary of the proposed employee is commensurate with similarly employed United States workers, that the working conditions of the proposed employees will not adversely affect the conditions of workers similarly employed, and that there is not a strike, lockout, or work stoppage at the company.

- Pursuant to 8 C.F.R. § 214.2(l)(15)(ii) the L-1 visa category applies to temporary business visitors who come to the United States. Under the law, this visa category only allows aliens to be employed within the United States if they have **specialized knowledge (L-1B)** or if they perform an **executive or managerial capacity** at an **American branch** of a multinational company **(L-1A)**. Additionally, an L-1 visa does not have the prevailing wage requirement the H-1B visa program has. The L1 visa program also is not limited by a quota on the number of L1 visas that the U.S. government will grant per year.

- Dependent Visas - The transferring employee may be accompanied or followed by his or her spouse and unmarried children who are under 21 years of age. Such family members may seek admission in L-2 nonimmigrant classification and, if approved, generally will be granted the same period of stay as the employee. If these family members are already in the United States and seeking change of status to or extension of stay in L-2 classification, they may apply collectively, with fee, on an Form I-539, Application to Change/Extend Nonimmigrant Status. A Dependent Visa is contingency on the beneficiary having been granted a visa.

- Extensions - For all L-1A and L-1B employees, requests for extension of stay may be granted in increments of up to an additional two years, until the employee has reached the maximum limit of seven years.

- Blanket Petitions – Pursuant to 8 CFR 214.2(l)(4) and 8 CFR 214.2(l)(5), certain organizations may establish the required intracompany relationship in advance of filing individual L-1 petitions by filing a blanket petition. Eligibility for blanket L certification may be established if: the petitioner and each of the qualifying organizations are engaged in commercial trade or services; the petitioner has an office in the United States which has been doing business for one year or more; the petitioner has three or more domestic and foreign branches, subsidiaries, and affiliates; and the petitioner along with the other qualifying organizations meet one of the following criteria: Have obtained at least 10 L-1 approvals during the previous 12-month period; Have U.S. subsidiaries or affiliates with combined annual sales of at least $25 million; or Have a U.S. work force of at least 1,000 employees. The approval of a blanket L petition does not guarantee that an employee will be granted L-1A classification. It does, however, provide the employer with the flexibility to transfer eligible employees to the United States quickly and with short notice **without having to file an individual petition with USCIS and prove eligibility**.

- Pursuant to the L-1 Visa Reform Act of 2004 ("L-1 Visa Reform Act") an alien is explicitly **ineligible** for classification as a specialized knowledge worker nonimmigrant (L-1B) visa if the worker will be "stationed primarily" at the worksite of an employer other than the petitioner or an affiliate, subsidiary, or parent and either of the following occurs: (a) the alien will be "principally" under the "control and supervision" of the unaffiliated employer, or (b) the placement at the nonaffiliated worksite is "essentially an arrangement to provide labor for hire for the unaffiliated employer," rather than a placement in connection with the provision of a product or service for which specialized knowledge specific to the petitioning employer is necessary. 214(c)(2)(F)

21. During the Relevant Period, TCS applied for greater than 30,000 L-1 workers using a visa petition. This number does not include extensions (each of which require their own certification) or petitions that were rejected, also fraudulent and consumed government resources to process.

22. In connection with arranging travel for L-1A (management workers) visa holders, L-1B (specialized knowledge) visa holders, and H-1B (technical workers/specialized occupation) visa holders, TCS generates or causes to be generated a petition stating in relevant part that certain TCS employees will travel to the United States in order to perform the functions as legally required, and as represented by TCS. These petitions were submitted to and reviewed by U.S. Consular Officials and other immigration officials, who expect that the information contained in the full petition (including supporting documentation) is a complete and accurate representation of the purpose of the trip, in support of the visa holder's, *i.e.*, L-1A, L-1B, or H-1B travel into the United States.

23. With each application submitted, whether it is an individual application, blanket petition (Nonimmigrant Petition based on Blanket L Petition) or extension, a certification by TCS is required. For example: "***I certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct. If filing this on behalf of an organization, I certify that I am empowered to do so by that organization. If this petition is to extend a prior petition, I certify that the proposed***

*employment is under the same terms and conditions as stated in the prior approved petition..."*

24. With each visa petition submitted, including blanket petitions, and extensions, including those submitted on behalf of dependents, the above certification was materially false. Had the United States Government realized the misrepresentations contained therein, approval would have been withheld.

25. The visa petitions that TCS submitted: (i) as they related to L-1B visas, were knowingly and intentionally submitted containing fraudulent information regarding the beneficiary's skill set, "specialized knowledge", experience and/or qualifications; (ii) as they related to L-1B visas, were knowingly and intentionally submitted containing fraudulent information regarding the end client's needs pertaining to TCS tools and TCS products that were represented to USCIS as *required* by end clients as well as exclusively possessed by TCS workers, simply because the petition required such information to be approved; (iii) as they related to L-1A visas, were knowingly and intentionally submitted containing made-up organizational charts to demonstrate a make-believe hierarchy, as required by the petitions; and (iv) as they related to L-1B visas, were knowingly and intentionally presented to USCIS using an L-1B petition when an H-1B petition was known by TCS to be the correct one, although financially disadvantageous to TCS.

26. TCS provides all potential beneficiaries several documents to "guide" them through completing the initial application and any extensions, (collectively, the "L-1B Guidelines").

27. The L-1B Guidelines "suggest" how a TCS worker should fill out the forms in order for TCS to secure approval from USCIS. The suggestions literally instruct the TCS worker to include statements on supporting documentation that are materially false including but not limited to their skill sets, experience generally as well as experience with TCS tools and products in

7

particular.

28. The L-1B Guidelines include notes in tracked changes listing TCS tools or products, *e.g.,* Integrated Insurance Management System ("IIMS") and Internal Project Management System ("IPMS"). While IIMS is a TCS insurance product in which Relator genuinely had experience using it because he was on the product development team in 2001-2002, Relator was not trained on it, nor did he use it in the 1990's. Training and usage of this product is for insurance company representatives. IPMS is actually a tool developed by TCS for *its own* time sheet capture, invoice raising and a billing tool for its various projects, both internal Self-Work Order Numbers ("SWON's") and external Work Order Numbers ("WON's"). IPMS is in no way required by an end-client and the TCS workers do not have, nor do they need such experience.

29. Listing IPMS for example, as a TCS "product" in which the TCS worker has expertise and using it in a petition as support to gain visa approval for an L-1B visa based on specialized knowledge, that will be required for client work, and further only because it is required by the L-1B category, is fraudulent, when submitted for the purpose of gaining approval when it wouldn't otherwise be granted. IPMS is simply an internal billing system used for TCS and has nothing to do with end clients as represented.

30. Although Relator had experience using TCS tools, and had used one briefly at one client, this was the only occasion when a TCS tool was ever necessary or had ever been required or used by an end client. The non-trivial tools were neither desired nor used, and that was always the plan. When a trivial "TCS tool" such as IPMS was listed on a petition or document in support thereof, it was used only as a timekeeping mechanism for Relator to enter his time for billing and nothing more. There was nothing unique about it.

31. When Relator had to interact with the TCS employees responsible for administering the visa

8

program within TCS (the "Visa Cell") in connection with Relator's extension, Relator was told that listing only IPMS, as had been done on initial applications, was no longer sufficient because USCIS "would not fall for that anymore".

32. Subsequent to Relator's submission of his CV and accompanying visa petition supporting documents to TCS which was reviewed by TCS, any potential discrepancies between the application and the CV were pointed out and Relator was required by TCS to update his CV to "clear up" any of the potential discrepancies. This was case for a substantial majority of TCS workers.

33. Instructions to "cleaning up" Relator's resume included inserting additional TCS product experience, the names of which were explicitly suggested by TCS, *i.e.*, IIMS, to be consistently included within multiple documents on multiple occasions, that were to be presented in support of his visa petition.

34. When Relator pointed out that the supporting documents were compliant "as is" without TCS's instructions to clean them up, TCS would then ask Relator to increase the duration of such experience.

35. Based on Relator's personal knowledge and experience, many of the applications were pre-populated by the Visa Cell operating in India and filing the extensions through TCS employees in the United States. TCS used the required (by USCIS) skill sets as a starting point, and then the potential beneficiaries were instructed to "fill in the gaps" to "match" the requirements – whether their skill sets actually matched or not.

36. By Relator's estimate based on personal knowledge, experience, speaking with beneficiaries, and his advanced degree in statistics, **less than 0.1%** of the L-1B applicants actually possessed the "specialized knowledge" required to secure an L-1B visa and only 5%-10% of the L-1A

9

visa applications were accurate based on physical location of the TCS worker at a TCS office.

37. The notes to the L-1B Guidelines also suggest, as they relate to describing the "Specialized nature of the Project", **"[please specify TCS proprietary tools used in this specific project. Justify the need for special tools/process or client proprietary tools, highlight benefits. Explain why TCS and TCS employees are required to complete this project, rather than non-TCS professionals.  ]"**, (bold language appears in original).

38. As a routine practice, after receiving L-1B candidates' curriculum vitae ("CV"), which required "specialized knowledge", TCS would regularly send the following, to every worker, **"Your Specialized knowledge details are missing in your CV"** and **"Please update your CV with TCS tools (for example, IMPS, Mastercraft, etc.)"**, with an additional instruction that the TCS tools on their CV should match the Project Role Description on the L-1B Guidelines that were provided by TCS.  The above was the rule and not the exception, regardless of what an L-1B applicant's CV contained, if it did not contain what TCS required it to contain in order to deceive USCIS.

39. On one occasion, when Relator received a copy of the approval from USCIS, Relator noticed that the application letter (which Relator nor his colleagues were ever provided with to review before submission to USCIS) contained a statement representing that the knowledge of such products would be required as part of the work with Relator's end-client.

40. Contrary to the L-1 Visa Reform Act, it was the end client and their employees who principally controlled and supervised Relator and his colleagues at all points during the Relevant Period.  The L-1A and L-1B TCS workers were simply being used by TCS and the end client, on the client's premises, as a labor for hire, performing identical duties as the individuals next to them who could be H-1B workers (from TCS or elsewhere), end client employees, or otherwise.

41. Although TCS workers obviously had knowledge of their own work experience, TCS went as far as sending applicants a "CV template", tried and true and clearly acceptable to USCIS, letting TCS applicants know that their petition would be approved only if their CV essentially matched the template and other "guidelines" provided by TCS in connection with the submission.

42. The templates and "suggestions" provided directly by TCS are consistent with each other and across all Guidelines. TCS workers are being forced to make up skills that they do not possess and experience working with TCS tools that they also do not possess, nor are such tools ever used by end clients, a related fraudulent representation. The logical result is that each initial application (individual and blanket), each extension, and ultimately any USCIS approval that flows from such initial application *e.g.*, dependent, is fraudulent, TCS is unjustly enriched, resources are wasted and what would be American jobs are essentially stolen by TCS.

43. Although the nature of the job market has changed over time, both H-1B and L-1 visa holders were being **placed by TCS on the same team** (separate from Relator), **performing the same exact functions** (contrary to the visa petition requirements and other immigration laws, including the L-1 Visa Reform Act) as recently as June 18, 2014, **doing the same exact work for clients, continuing to be trained and supervised by end clients**.

44. Because of the high rejection rates for L-1 visas, initial applications decreased in the last 4-5 years, however, extensions, which have the effect of re-certifying the requirements of the initial application, have been filed recently.

45. The same process as above was also followed as recently for other TCS consultants from the same team he was on as well. After a period of time, due to the unemployment percentage being so high in the United States at that time, many of the applications for extensions were denied, however, the applications and extensions were fraudulent.

46. Similarly to how TCS prepares L-1B Guidelines, TCS employs an identical strategy for TCS workers seeking L-1A visas ("L-1A Guidelines").  L-1A Guidelines also "suggest" how a TCS worker should complete the supporting documentation that becomes part of the overall petition ultimately submitted to USCIS.

47. One of the items contained in the L-1A Guidelines requires the completion of an organizational chart, in order to demonstrate that a subordinate TCS employee regularly reports to a superior TCS employee (rather than an employee of the end client), as required by the L-1A visa application.

48. Each time an extension was required, Relator and his counterparts would essentially take turns acting as the "superior" or alternatively, the "subordinate", in order for TCS to maintain the requirements, when in reality, the organizational chart was a fiction, in violation of the L-1 Visa Reform Act. This fact was known to TCS.

49. The comments provided from TCS include, "**Prepare Organization Chart showing only 1 Level above you and Any Number of Levels below you.**"  In Relator's experience, as mentioned above, the organizational charts provided to USCIS were created solely for the purpose of gaining approval and were not only *not* reflective of the actual hierarchy, but in most cases, they were simply made up, in random orders, *i.e.*, the workers "took turns" being at the top of the organizational chart, contrary to L-1A visa requirements.

50. Upon information and belief, the organizational charts were created solely to be submitted to USCIS, not used for any other purpose and were irrelevant to the end client.

51. TCS also provided instructions to L-1A and L-1B visa applicants in the form of one page memos, and various other reminders that had the intention and effect of deceiving U.S. Consular Officials and/or Customs and Border Protection Officers.

52. In some circumstances, based on Relator's conversations with other TCS workers, TCS Visa Cell employees physically pushed aside applicants and personally entered the fraudulent statements in the supporting documentation that the Visa Cell employees knew would have the best chance of getting rubberstamped for approval.

53. In multiple discussions with TCS colleagues in the past and more recently, Relator learned that the same process as described above was their identical experience.

54. Although TCS employees, including Relator, felt that TCS was acting inappropriately, nobody raised the issue as far as Relator is aware because Relator and anyone with whom Relator spoke believed that TCS wouldn't do anything illegal due to the nature of their business, the risk involved, and concluded everything must be "above board".

55. In or around 2014, Relator read on the internet about another case involving visa fraud. In or around this time, Relator realized that what he had experienced, and has good reason to believe continues, as he is in contact with individuals currently on extensions through TCS, is nearly identical to his experience and his colleagues, which lead to the instant Complaint.

56. During the Relevant Period, Relator was privy to intimate details of TCS's schemes to use the L-1A and L-1B visa programs to "creatively" get around the H-1B restrictions placed by the United States and to work the system in order to increase profits and the value of TCS's stock.

57. During the Relevant Period, TCS circumvented the requirements, limitations, and governmental oversight of the H-1B visa program.

58. TCS knowingly and unlawfully used L-1A (management workers) and L-1B (specialized knowledge) visa holders in order to fill positions in the United States for employment that would otherwise be performed by United States citizens or require legitimate H-1B visa holders, for the purposes of increasing profits, minimizing costs of securing visas, increasing flexibility of

13

employee movement, obtaining an unfair advantage over competitors, and avoiding tax liabilities.

59. Relator witnessed violations of federal laws and regulations governing the visa program, including TCS's schemes to "work around" the H-1B program when possible, in order to maximize the amount of foreign workers employed by American companies, contrary to the visa program requirements that are designed to protect American workers.

60. The fraudulent practices of TCS as set out herein of illegally employing foreign nationals in the United States to work on client sites under improper visas in contravention of federal law is not only at the expense of qualified American citizens failing to obtain these jobs, but the fraud and abuse of the visa immigration system by TCS necessarily resulted in an extreme amount of waste of United States Government resources over a substantial period of time.

61. During the Relevant Period, TCS carried out this illegal conduct to increase its profits.

62. TCS regularly and systematically defrauded the H-1B and L visa programs.

63. During the Relevant Period, the L-1B petitions were regularly falsified by claiming that alien workers had "specialized knowledge" as required for USCIS approval, however, these alien employees were and upon reasonable belief, continue to perform typical IT work and fill IT positions at American companies, that Americans could easily fill.

64. The visa approvals based on the fraudulent submissions result in TCS L-1 employees working directly along-side H-1B visa holders from other consulting firms that duly filed their visa applications, as well as employees of the end-clients.

65. Fraudulent representations made to the end-clients and certified to the United States Government by TCS is an extremely large ploy to get their employees working in the United States at end-clients regardless of visa requirements, with the sole purpose of increasing

revenues. The applications were falsified to make it appear that the TCS employees had, or would use, specialized knowledge in their positions, which when compared with their counterparts, as noted above, was not at all "specialized".

66. TCS used the L-1 visa petitions as a mill in quickly churning out alien workers for TCS's American company clients.

67. Had USCIS known of the allegations contained herein, such petitions would never have been granted, resources would never have been wasted, the number of unemployed American workers in the IT industry during the Relevant Period would have been less, and TCS would not have been unjustly enriched at the expense of the United States Government, the American workers, the end clients, and the American tax payers.

68. Upon information and belief, many American workers were "benched" by TCS, essentially precluded from high-paying jobs, in lieu of aliens with fraudulent visa applications.

69. TCS's scheme of sending employees to the United States to work in full-time jobs on client sites on L-1A and L-1B visas benefits TCS insomuch as upon information and belief, the TCS workers are paid substantially less than American workers and/or H-1B employees, which allows TCS to undercut other consulting agencies, staffing companies, and ultimately the American worker.

70. Based on the parties at TCS involved with committing the fraud, with intimate knowledge of it taking place if not actively orchestrating it, as well as the motivation to continue to commit such fraud, Relator has very good reason to believe that the fraudulent activity described herein was not isolated to only these applications mentioned and continues today in various ways.

71. Each application submitted that contains fraudulent information on behalf of every beneficiary during the Relevant Period, pursuant to an individual or blanket petition, extension and

dependent is a violation of the False Claims Act.

72. TCS exercises complete and total control over the visa application process on behalf of the beneficiaries, submitting applications via a power of attorney to TCS's lawyer, and then directly to the United States Government, with the beneficiary not approving, signing, or ever seeing the final submission.

73. TCS submitted, or caused the submission of, false statements and records with knowledge of the falsity. In § 3729(b)(1), knowledge of false information is defined as being (1) actual knowledge, (2) deliberate ignorance of the truth or falsity of the information, or (3) reckless disregard of the truth or falsity of the information.

74. The facts described herein were Relator's common experience across not only each of the initial visa petitions from India submitted by TCS, but also relate to the extensions, which required **recertifying the accuracy and truthfulness of the initial petition**, and any visa changes, *e.g.*, from L-1B to L-1A.

75. Based on its allegations in this Complaint, Relator asserts on behalf of the United States that it has certain civil and criminal claims against TCS arising under the following laws:

## VI. CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(A))

76. Relator incorporates by reference and realleges all paragraphs of this Complaint set forth above as if fully set forth herein.

77. Relator further states that from on or about 2002-2013 and upon reasonable belief, prior to and continue through the present, TCS knowingly presented, or caused to be presented, to employees of the United States, false and fraudulent claims for property or approval, a

violation of 31 U.S.C. § 3729(a)(1)(A).

78. Defendants, by and through its officers, agents, and employees knowingly made, used, or caused to be made or used, false records and/or statements material to its obligation to pay or transmit money to the United States and/or knowingly concealed, avoided or decreased its obligations to pay or transmit money or property to the Government.

79. Defendants authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

80. The United States Government, American workers and the public have been damaged as a result of Defendants' violations of the False Claims Act.

81. As a direct and proximate result of these materially false records or false statements, intentionally submitted by the Defendants for approval by the United States Government, the United States Government has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the False Claims Act.

## COUNT II

### VIOLATION OF THE FALSE CLAIMS ACT
### (31 U.S.C. § 3729(a)(1)(B))

82. Relator incorporates by reference and realleges all paragraphs of this Complaint set forth above as if fully set forth herein.

83. From on or about 2002-2013 and upon reasonable belief, prior to and continuing through the present, the Defendants knowingly made, used or caused to be made or used, and continue to make, use and cause to be made or used, false records or false statements in primary petitions (individual and blanket), dependent applications and extensions, that are material to the

foregoing false or fraudulent claims, such that these false claims, false records or false statements would be approved by the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

84. These Defendants' knowingly make, use and cause to be made or used, false records or false statements which were material, and upon information and belief continue to be material, to the false and fraudulent claims for approval by the United States Government that Defendants made and continue to make to the United States in connection with securing visa approvals at any cost to increase Defendants' profits.

85. Defendants, by and through its officers, agents, and employees knowingly made, used, or caused to be made or used, false records and/or statements material to its obligation to pay or transmit money to the United States and/or knowingly concealed, avoided or decreased its obligations to pay or transmit money or property to the Government.

86. These said false records or false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with these Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

87. As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by the Defendants for approval by the United States Government, the United States Government has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the False Claims Act.

## COUNT III

## VIOLATION OF THE FALSE CLAIMS
## ACT  (31 U.S.C. § 3729(a)(1)(G))

88.  Relator incorporates by reference and realleges all paragraphs of this Complaint set forth
above as if fully set forth herein.

89.  Upon information and belief, from on or about 2002-2013 and upon reasonable belief, prior
to and continuing through the present, the Defendants knowingly made, used or caused to be
made or used false records or false statements, and continue to knowingly make, use or caused
to be made false records or false statements, material to an obligation to pay or transmit money
or property to the United States Government, or knowingly concealed and upon information
and belief continue to conceal an obligation to pay or transmit money or property to the United
States Government, or knowingly and improperly avoided or decreased, and upon information
and belief continue to knowingly and improperly avoid and decrease, an obligation to pay or
transmit money or property to the United States Government, in violation of 31 U.S.C. §
3729(a)(1)(G).

90.  These said false records or statements were presented, and upon information and belief
continue to be presented, with actual knowledge of their falsity, or with reckless disregard or
deliberate ignorance of whether or not they were false.

91.  As a direct and proximate result of these knowingly false records or false statements by the
Defendants, the United States has suffered damages and therefore is entitled to recovery as
provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty
of $5,500 to $11,000 for each violation of the False Claims Act.

22

## COUNT IV

## VIOLATION OF THE FALSE CLAIMS ACT
## (31 U.S.C. § 3729(a)(1)(C))

92. Relator incorporates by reference and realleges all paragraphs of this Complaint set forth above as if fully set forth herein.

93. Upon information and belief, From on or about 2002-2013 and upon reasonable belief, prior to and continuing through the present, each of the Defendants individually and collectively, in concert, along with their officers and authorized agents, conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), 31 U.S.C. § 3729(a)(1)(B), and 31 U.S.C. § 3729(a)(1)(G) in violation of 31 U.S.C. § 3729(a)(1)(C).

94. As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by the Defendants for approval by the United States Government, the United States Government has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the False Claims Act.

### CLAIMS FOR RELIEF

WHEREFORE, Relator, on behalf of himself and the United States Government, prays:

(i)    Three times the amount of damages that the Government sustained because of **TCS's** conduct;

(ii)    that this Court enter a judgment against Defendant for a civil penalty of $11,000 for each of Defendant's violations of the False Claims Act;

(iii)    that Relator be awarded all reasonable attorneys' fees in bringing this action;

(iv)    that in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 30% of the proceeds of the action;

(v)     that in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action plus all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(vi)    that Relator be awarded prejudgment interest;

(vii)   that a trial by jury be held on all issues so triable; and

(viii)  that Relator, the United States of America, receive all relief to which either or both may be entitled at law or in equity.

*Relator Demands a Trial by Jury*

By: JAJ2397
Jared A. Jacobson, Esq.
PA Attorney ID: 201382
Franklin J. Rooks Jr., Esq.
PA Attorney ID: 309562
Jacobson & Rooks, LLC
1500 JFK Blvd., Suite 520
Philadelphia, PA 19002
T:(215) 874-8808
F: (609) 543-2600
jjacobson@jacobsonrooks.com
fjrooks@jacobsonrooks.com

*Counsel for Relator, Bedatanu Banerjee*

Date: August 3, 2016

21